FILED

**IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

2008 DEC 30 P 12: 34

CLERK US DISTRICT COURT
RICHMOND, VIRGINIA

| | |
|---|---|
| VICKI L. ISEMAN, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) CASE NO.: 3:08CV848 |
| THE NEW YORK TIMES COMPANY, | ) |
| WILLIAM KELLER | ) |
| JAMES RUTENBERG, | ) |
| MARILYN THOMPSON, | ) |
| STEPHEN LABATON, | ) |
| DAVID KIRKPATRICK, and | ) JURY DEMAND |
| DEAN BAQUET, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT FOR DEFAMATION

### I. Introduction

1. This is an action for defamation brought by the Plaintiff, Ms. Vicki L. Iseman, against

the Defendants, The New York Times Company, William Keller, James Rutenberg, Marilyn

Thompson, Stephen Labaton, David Kirkpatrick, and Dean Baquet, ("the New York Times

Defendants") arising from a story published in *The New York Times* on February 21, 2008,

falsely communicating that Ms. Iseman and Senator John McCain had an illicit "romantic" and

unethical relationship in breach of the public trust in 1999, while Senator McCain was Chairman

of the United States Senate Committee on Commerce, Science, and Transportation, and while

1

Dockets.Justia.com

Ms. Iseman was representing clients as a lobbyist on matters relating to the business of the Committee.

## II. Jurisdiction

2. This Court has diversity jurisdiction under 28 U.S.C. § 1332. Ms. Iseman is a citizen of Virginia and domiciled in this District. None of the Defendants are citizens of Virginia. The amount in controversy exceeds $75,000, exclusive of interest and costs.

## III. Parties

3. The Plaintiff Ms. Vicki L. Iseman is a resident and citizen of Virginia. Ms. Iseman works as a lobbyist. She is a partner of the firm of Alcalde & Fay, located in Arlington, Virginia. She regularly represents clients on matters pending before federal agencies and the Congress of the United States.

4. The Defendant The New York Times Company is a media corporation with its principal place of business in New York. It is the publisher of *The New York Times*, a newspaper published in print and on-line, with a world-wide circulation. *The New York Times* is sold throughout Virginia and the New York Times Company actively solicits readers in Virginia, transacts business in Virginia, and purposefully avails itself of the laws of Virginia.

5. William ("Bill") Keller is the Executive Editor for *The New York Times*. He exercised supervisory authority over the reporters responsible for the defamatory article, and was the editor chiefly responsible for drafting and editing the defamatory article, and for making the final decision to publish the article. Mr. Keller resides in New York.

6. The Defendant James Rutenberg is a reporter for *The New York Times* and one of the authors of the defamatory article; he resides in New York.

7. Marilyn W. Thompson was formerly a reporter for *The New York Times* and one of the authors of the defamatory article; she resides in Washington, D.C.

8. Stephen Labaton is a reporter for *The New York Times* and one of the authors of the defamatory article; he resides in Washington, D.C..

9. David E. Kirkpatrick is a reporter for *The New York Times* and one of the authors of the defamatory article; he resides in Washington, D.C..

10. Dean Baquet is an editor for *The New York Times*. He was the chief of the Washington Bureau of *The New York Times* and one of the editors responsible for drafting and editing the defamatory article; he resides in Washington, D.C.

### IV. The Defamatory Article

11. The defamatory article upon which this defamation claim is based was entitled "For McCain, Self-Confidence on Ethics Poses Its Own Risk." The defamatory article was published in *The New York Times* on February 21, 2008, in its print and on-line editions, and distributed world-wide. The article appeared on the front page of *The New York Times* in a position "above the fold" of the paper, emphasizing its importance and adding to the attention it received. While published on February 21, 2008, the article focused on events from nine years before, in 1999. The article included a photograph of Ms. Iseman, appearing in an evening dress. The entire article is attached to this Complaint as Exhibit A.

12. The opening four paragraphs of the article read:

> Early in Senator John McCain's first run for the White House eight years ago, waves of anxiety swept through his small circle of advisers

A female lobbyist had been turning up with him at fund-raisers, visiting his offices and accompanying him on a client's corporate jet. Convinced the relationship had become romantic, some of his top advisers intervened to protect the candidate from himself—instructing staff members to block the woman's access, privately warning her away and repeatedly confronting him, several people involved in the campaign said on the condition of anonymity.

When news organizations reported that Mr. McCain had written letters to government regulators on behalf of the lobbyist's client, the former campaign associates said, some aides feared for a time that attention would fall on her involvement. Mr. McCain, 71, and the lobbyist, Vicki Iseman, 40, both say they never had a romantic relationship.

But to his advisers, even the appearance of a close bond with a lobbyist whose clients often had business before the Senate committee Mr. McCain led threatened the story of redemption and rectitude that defined his political identity. It had been just a decade since an official favor for a friend with regulatory problems had nearly ended Mr. McCain's political career by ensnaring him in the Keating Five scandal. In the years that followed, he reinvented himself as the scourge of special interests, a crusader

4

for stricter ethics and campaign finance rules, a man of honor chastened by a brush with shame.

But the concerns about Mr. McCain's relationship with Ms. Iseman underscored an enduring paradox of his post-Keating career. Even as he vowed to hold himself to the highest ethical standards, his confidence in his own integrity has sometimes seemed to blind him to potentially embarrassing conflicts of interest. Mr. McCain promised, for example, never to fly directly from Washington to Phoenix, his hometown, to avoid the impression of self-interest because he sponsored a law that opened the route nearly a decade ago. But like other lawmakers, he often flew on the corporate jets of business executives seeking his support, including media moguls Rupert Murdoch, Michael R. Bloomberg and Lowell W. Paxson, Ms. Iseman's client. (Last year he voted to end the practice.)

Mr. McCain helped found a nonprofit group to promote his personal battle for tighter campaign finance rules. But he later resigned as its chairman after news reports disclosed that the group was tapping the same kinds of unlimited corporate contributions he opposed, including those from companies seeking his favor. He has criticized the cozy ties between lawmakers and lobbyists, but is relying on corporate lobbyists to donate their time running his

presidential race and recently hired a lobbyist to run his Senate office.

> "He is essentially an honorable person," said William P. Cheshire, a friend of Mr. McCain who as editorial page editor of The Arizona Republic defended him during the Keating Five scandal. "But he can be imprudent."

13. The article followed with a paragraph describing briefly the "Keating Five" scandal from ten years before, a scandal in which Senator McCain was tangentially implicated. The paragraph described Senator McCain's positions on issues such ethics-related issues as lobbying and campaign finance. This segment ended with a paragraph that read:

> "Unless he gives you special treatment or takes legislative action against his own views, I don't think his personal and social relationships matter," said Charles Black, a friend and campaign adviser who has previously lobbied the senator for aviation, broadcasting, and tobacco concerns.

14. The article then returned to its opening lead theme, the alleged romantic relationship between Ms. Iseman and Senator McCain:

> Mr. McCain's confidence in his ability to distinguish personal friendships from compromising connections was at the center of questions advisors raised about Iseman.

> The lobbyist, a partner at the firm Alcalde & Fay, represented telecommunications companies for whom Mr.

McCain's commerce committee was pivotal. Her clients contributed tens of thousands of dollars to his campaigns.

Mr. Black said Mr. McCain and Ms. Iseman were friends and nothing more. But in 1999 she began showing up so frequently in his offices and at campaign events that staff members took notice. One recalled asking, "Why is she always around?"

That February, Mr. McCain and Ms. Iseman attended a small fund-raising dinner with several clients at the Miami-area home of a cruise-line executive and then flew back to Washington along with a campaign aid on the corporate jet of one of her clients, Paxson Communications. By then, according to two former McCain associates, some of the senator's advisors had grown so concerned that the relationship had become romantic that they took steps to intervene,

A former campaign advisor described being instructed to keep Ms. Iseman away from the senator at public events, while a Senate aide recalled plans to limit Ms. Iseman's access to his offices.

In interviews, the two former associates said they joined in a series of confrontations with Mr. McCain, warning him that he was risking his campaign and career. Both said Mr. McCain acknowledged behaving inappropriately and pledged to keep his distance from Mr. Iseman. The two associates, who said they had

become disillusioned with the senator, spoke independently of each other and provided details that were corroborated by others.

Separately, a top McCain aide met with Ms. Iseman at Union Station in Washington to ask her to stay away from the senator. John Weaver, a former top strategist and now an informal campaign adviser, said in an e-mail message that he arranged the meeting after "a discussion among the campaign leadership" about her.

"Our political messaging during that time period centered around taking on the special interests and placing the nation's interests before either personal or special interest," Mr. Weaver continued. "Ms. Iseman's involvement in the campaign, it was felt by us, could undermine that effort."

Mr. Weaver added that the brief conversation was only about "her conduct and what she allegedly had told people, which made its way back to us." He declined to elaborate.

It is not clear what effect the warnings had; the associates said their concerns receded in the heat of the campaign.

Ms. Iseman acknowledge meeting with Mr. Weaver, but disputed his account.

"I never discussed with him alleged things I had 'told people,' that had made their way 'back to' him," she wrote in an e-

mail message. She said she had never received special treatment from Mr. McCain's office.

Mr. McCain said that the relationship was not romantic and that he never showed favoritism to Ms. Iseman or her clients. " I have never betrayed the public trust by doing anything like that," he said. He made the statements in a call to Bill Keller, the executive editor of The New York Times, to complain about the paper's inquiries.

The senator declined repeated interview requests, beginning in December. He also would not comment about the assertions that he had been confronted about Ms. Iseman, Mr. Black said Wednesday.

Mr. Davis and Mark Salter, Mr. McCain's top strategists in both of his presidential campaigns, disputed accounts from the former associates and aides and said they did not discuss Ms. Iseman with the senator or colleagues.

"I never had any good reason to think that the relationship was anything other than professional, a friendly professional relationship," Mr. Salter said in an interview.

He and Mr. Davis also said Mr. McCain had frequently denied requests from Ms. Iseman and the companies she represented. In 2006, Mr. McCain sought to break up cable subscription packages, which some of her clients opposed. And his

proposals for satellite distribution of local television programs fell short of her clients' hopes.

The McCain aides said the senator sided with Ms. Iseman's clients only when their positions hewed to his principles.

A champion of deregulation, Mr. McCain wrote letters in 1998 and 1999 to the Federal Communications Commission to uphold marketing agreements allowing a television company to control two stations in the same city, a crucial issue for Glencairn Ltd., one of Ms. Iseman's clients. He introduced a bill to create tax incentives for minority ownership of stations; Ms. Iseman represented several businesses seeking such a program. And he twice tried to advance legislation that would permit a company to control television stations in overlapping markets, an important issue for Paxson.

In late 1999, Ms. Iseman asked Mr. McCain's staff to send a letter to the commission to help Paxson, now Ion Media Networks, on another matter. Mr. Paxson was impatient for F.C.C. approval of a television deal, and Ms. Iseman acknowledged in an e-mail message to The Times that she had sent to Mr. McCain's staff information for drafting a letter urging a swift decision.

Mr. McCain complied. He sent two letters to the commission, drawing a rare rebuke for interference from its chairman. In an embarrassing turn for the campaign, news reports

invoked the Keating scandal, once again raising questions about intervening for a patron.

Mr. McCain's aides released all of his letters to the F.C.C. to dispel accusations of favoritism, and aides said the campaign had properly accounted for four trips on the Paxson plane. But the campaign did not report the flight with Ms. Iseman. Mr. McCain's advisers say he was not required to disclose the flight, but ethics lawyers dispute that.

Recalling the Paxson episode in his memoir, Mr. McCain said he was merely trying to push along a slow-moving bureaucracy, but added that he was not surprised by the criticism given his history.

"Any hint that I might have acted to reward a supporter," he wrote, "would be taken as an egregious act of hypocrisy."

### Statement by McCain

Mr. McCain's presidential campaign issued the following statement Wednesday night:

"It is a shame that The New York Times has lowered its standards to engage in a hit-and-run smear campaign. John McCain has a 24-year record of serving our country with honor and integrity. He has never violated the public trust, never done favors for special interests or lobbyists, and he will not allow a smear campaign to distract from the issues at stake in this election.

11

"Americans are sick and tired of this kind of gutter politics,

and there is nothing in this story to suggest that John McCain has

ever violated the principles that have guided his career."

## V. The Article's Defamatory Meanings

15. The article was reasonably susceptible of two levels of false and defamatory meanings, constituting "defamation per se" under Virginia law.

16. The first defamatory meaning was that Ms. Iseman exploited an alleged personal and social friendship with Senator McCain to obtain favorable legislative outcomes for her clients, engaging in "inappropriate" behavior that constituted a conflict of interest and a violation of professional and ethical norms in breach of the public trust. This meaning was communicated through the literal words of the article and also by implication, by what was intentionally suggested and implied "between the lines."

17. The second defamatory meaning was that Ms. Iseman and Senator McCain had engaged in an illicit and inappropriate romantic relationship while Ms. Iseman was a lobbyist conducting business on behalf of clients before the committee chaired by Senator McCain. This was also defamation per se under Virginia law. This meaning was also communicated through the literal words of the article and by implication, by what was suggested and implied "between the lines."

18. That the two defamatory meanings alleged in this Complaint were in fact the meanings borne by the article is evidenced by the ordinary and everyday meanings, express and implied, of the specific words and phrases employed in the article, and also by how the article was *in fact* received and understood by readers, other news organizations, and commentators.

12

19. Turning first to the ordinary and everyday meanings, express and implied, of the words and phrases used in the article, the article's defamatory meanings were communicated principally in the long opening and closing segments of the article. In the opening sentence, the article began with the dramatic claim that "waves of anxiety swept through his small circle of advisers," thereby signaling at the outset the article's pervasive theme that Senator McCain had engaged in career-threatening behavior. The next sentence was immediately suggestive of an illicit relationship: "A female lobbyist had been turning up with him at fund-raisers, visiting his offices and accompanying him on a client's corporate jet." The "female lobbyist" was then immediately linked to a *romantic relationship* with Senator McCain, by the sentence: "Convinced the relationship had become romantic, some of his top advisers intervened to protect the candidate from himself—instructing staff members to block the woman's access, privately warning her away and repeatedly confronting him, several people involved in the campaign said on the condition of anonymity." The phrase "the relationship had become romantic," the phrase "intervened to protect the candidate from himself," the phrase "block the woman's access," the phrase "privately warning her away," and the phrase "repeatedly confronting him" were all designed to powerfully conjure an image of Ms. Iseman and Senator McCain engaging in a blatant and public romantic relationship that was reckless and inappropriate. After a narrative that reinforced these themes, the article again resorted to a calculated sequence of loaded phrasing, describing McCain as "a man of honor chastened by a brush with shame" and then transitioning to "concerns about Mr. McCain's relationship with Ms. Iseman" linked explicitly to unethical behavior amounting to a "conflict of interest." This phrasing was thus also calculated to cast "shame" on Ms. Iseman. There is no "conflict of interest" when a lobbyist advances the interests of her clients in a lawful, professional, and transparent manner. The statement that there

was a "conflict of interest" in relation to Ms. Iseman was thus sensible only on the supposition that Senator McCain was inappropriately involved with Ms. Iseman in a manner sufficiently significant to rise to the level of such a "conflict" and that improper legislative favors were performed. The article's repeated use of the word "romantic" was deliberately calculated to convey the full range of meanings commonly associated with that term, intentionally conveying such severe insinuations of misconduct sufficient to constitute a career-threatening conflict of interest. This theme was in turn punctuated by the sentence that stated: "Even as he vowed to hold himself to the highest ethical standards, his confidence in his own integrity has sometimes seemed to blind him to potentially embarrassing conflicts of interest." After more discussion of Senator McCain's career, the article quoted William P. Cheshire for the proposition that Senator McCain "can be imprudent," a phrase again suggesting reckless behavior.

20. The defamatory meanings of the article, express and implied, intensified in the second major segment of the article, appearing after the interlude in which the article described the Keating Five scandal and Senator McCain's positions on ethical issues such as lobbying and campaign finance. The article thus returned again to the relationship with Ms. Iseman, by stating that "Mr. McCain's confidence in his ability to distinguish personal friendships from compromising connections was at the center of questions advisors raised about Iseman." The use of the suggestive phrase "compromising connections" openly suggested that the alleged relationship between Ms. Iseman and Senator McCain was "compromising," a loaded word that would reasonably be interpreted as connoting unethical or immoral behavior, including an inappropriate romantic relationship. The article then engaged in the classic phrasing of gossip and innuendo that two people are having an inappropriate romantic relationship, with the

14

passage: "But in 1999 she began showing up so frequently in his offices and at campaign events that staff members took notice. One recalled asking, "Why is she always around?""

21. The article then contained a series of passages creating the impression that *The New York Times* had uncovered the details of this alleged romantic relationship. Thus the article focused on the plane ride on a corporate jet, and how this incident caused aids to intervene to stop the allegedly romantic relationship: "That February, Mr. McCain and Ms. Iseman attended a small fund-raising dinner with several clients at the Miami-area home of a cruise-line executive and then flew back to Washington along with a campaign aid on the corporate jet of one of her clients, Paxson Communications. By then, according to two former McCain associates, some of the senator's advisors had grown so concerned that the relationship had become romantic that they took steps to intervene."

22. The article then catalogued the alleged efforts at confrontation and intervention by aids, stating that a "former campaign advisor described being instructed to keep Ms. Iseman away from the senator at public events, while a Senate aide recalled plans to limit Ms. Iseman's access to his offices."

23. In one of the single most damaging passages, the article then created the impression that Senator McCain had *confessed* unethical and inappropriate behavior with Ms. Iseman, including a suggestion that Senator McCain had confessed to having a romantic relationship with Ms. Iseman: "In interviews, the two former associates said they joined in a series of confrontations with Mr. McCain, warning him that he was risking his campaign and career. Both said Mr. McCain *acknowledged behaving inappropriately* and *pledged to keep his distance* from Mr. Iseman. The two associates, who said they had become *disillusioned* with the senator, spoke independently of each other and provided *details that were corroborated* by others." (Emphasis

supplied.) This passage was steeped in defamatory meaning. The "confrontations" described in the first sentence were presented as matters of the highest order—so serious that they put Senator McCain's entire career and presidential campaign at risk. Only bad behavior of the most serious nature, such as having a romantic relationship with a lobbyist who was seeking improper legislative favors, would warrant such grave concerns. This was followed by the blockbuster "admission" by Senator McCain, in which the article claimed "that McCain *acknowledged behaving inappropriately* and *pledged to keep his distance* from Mr. Iseman." This goes behind implication, by explicitly stating *as a fact* that Senator McCain admitted that he had engaged in "*inappropriate*" behavior with Ms. Iseman and "*pledged*" to "keep his distance from Ms. Iseman." Reasonable readers would understand this as a confession of guilt by Senator McCain to his aids, a statement plainly susceptible of both the defamatory meanings asserted in this Complaint, that Ms. Iseman and Senator McCain had engaged in "inappropriate" behavior through an alleged personal and social relationship that was "compromising" and constituting a "conflict of interest," as well as the more pointed defamatory meaning that Ms. Iseman and Senator McCain had engaged in an inappropriate romantic relationship. While both these meanings were communicated by this passage, the connotation of an inappropriate romantic relationship conveyed by the passage is even more pointed than the connotation of a professional quid pro quo. There would have been no need for a "pledge" to keep his distance if the relationship with Ms. Iseman were innocuous. Rather, the claim that Senator McCain "pledged to keep his distance from Ms. Iseman" is phrasing commonly associated with someone breaking off an inappropriate romantic relationship and promising to stay away from that person.

24. To add verisimilitude and gravity to the account, the damning passage recounting Senator McCain's confession included the claim that the "two associates, *who said they had*

*become disillusioned with the senator,* spoke independently of each other and *provided details that were corroborated by others.*" The asserted disillusionment of the "associates" again underscored the gravity of his alleged misdeeds, while the cryptic invocation of "details corroborated by others" deliberately implied that *The New York Times* had additional "details," though not details disclosed to readers, about the alleged inappropriate behavior between Ms. Iseman and Senator McCain, details that had been "corroborated by others."

25. Building upon this suggestion of "details," the article then described the alleged content of a meeting at Union Station in Washington between John Weaver, then a top McCain political advisor, and Ms. Iseman. The article presented this meeting as motivated by Weaver's concern that Senator McCain's "political messaging" was that the nation's interest should be placed above "either personal or special interest," a plain statement that Ms. Iseman was the object of "personal" or "special" interest. In a highly suggestive and salacious quotation attributed to Mr. Weaver, the article claimed that Mr. Weaver's confrontation with Ms. Iseman at Union Station was about "what she allegedly had told people," noting that he "declined to elaborate," creating the impression that Ms. Iseman had told people that she was romantically or personally involved with Senator McCain. The article again moved to a sinister cast, describing these communications as "warnings" to Ms. Iseman.

26. The article did print the fact that Ms. Iseman and Senator McCain had denied any romantic relationship or other inappropriate conduct. These denials, which most readers would understand as "obligatory," and therefore precisely what Ms. Iseman and Senator McCain *would be expected to say*, did not negate the defamatory meanings that otherwise pervaded the article, as articulated in this Complaint. Indeed, that *The New York Times* would make such aggressive and sensational allegations and insinuations *in the face of on-the-record denials* by Ms. Iseman

and Senator McCain only reinforced the message to readers that *The New York Times* in fact *believed* that Ms. Iseman and Senator McCain had indeed engaged in an "inappropriate relationship," a relationship that was romantic, unethical, and a conflict of interest. Otherwise, reasonable readers would conclude, *The New York Times* would never have printed the story at all.

27. Setting aside the heavy emphasis on the allegedly inappropriate romantic relationship between Ms. Iseman and Senator McCain, the article contained no reporting that was new or newly newsworthy. The article rehashed material from stories from many years before that had often been reported by *The New York Times* and other news organizations regarding events such as the Keating Five scandal. More significantly, the events surrounding Ms. Iseman and Senator McCain all took place in 1999, *nine years before* the February 21, 2008 article was published, and all of those events *except those elements of the story relating to Ms. Iseman* had previously been covered by the news organizations at length, including *The New York Times*. Indeed, the Defendant Stephen Labaton had previously written a contemporaneous account of the 1999 events, exploring the activity of Senator McCain in relation to the Federal Communications Committee, yet had never, in those contemporaneous accounts, mentioned Ms. Iseman.

28. In sum, taken as a whole, the article would be understood by the average reader as communicating the defamatory meaning that Ms. Iseman engaged in an unprofessional and unethical exploitation of a personal relationship with Senator McCain, and that Ms. Iseman had an improper romantic relationship with Senator McCain, a married man, from which she gained advantage for her professional clients.

29. The defamatory meanings alleged in this Complaint were not and could not have been mere happenstance or accident. The reporters and editors at *The New York Times* used

phrasing, sequencing, and structuring in an intentional, calculated, and concerted design to convey the defamatory meaning that Ms. Iseman and Senator McCain had engaged in a romantic and unprofessional relationship.

30. That the article was reasonably susceptible of carrying the defamatory meanings ascribed to the article by this Complaint is underscored by the fact that these defamatory meanings were precisely the meanings immediately ascribed to the article by average readers, and by other media outlets, commentators, and bloggers throughout the nation and the world, spanning a broad cross-section of society.

31. Thousands of e-mail messages to *The New York Times* and exponentially more e-mail messages, blogs, and Internet postings interpreted the article as implying the existence of an illicit romantic and unethical professional relationship between Ms. Iseman and Senator McCain. A chorus swept across broadcast, print, and on-line media, coming from a wide variety of voices and spanning the political and ideological spectrum, all partaking of the common premise that the core meaning of *The New York Times* article was that Senator McCain and Ms. Iseman had engaged in an improper romantic relationship and improper professional relationship. This was how the marketplace *in fact* reacted to the article. This was how the article was *in fact* understood. If this is how the article was *in fact* received by average readers and public commentators, it follows automatically that, for the purposes of this defamation claim, this is how the article could *reasonably be understood.*

32. Representative samples of how the article was understood included the following statements, attached to this Complaint in their entirety for the convenience of the Court:

- Evan Thomas and Michael Isikoff, writing in *Newsweek*, wrote that *The New York Times* had "implied as much" that Ms. Iseman and Senator McCain "were sleeping together or that he was performing legislative favors for her."

- Patrick Buchannan, appearing on a MSNBC television program "Tucker," with its host Tucker Carlson, stated: "*The New York Times* has come out and said, you know, yesterday, in effect, they implied that he's having an affair with this lobbyist, with this firm, and because of this affair, with his mistress he's doing favors for the firm and for whom they represent. . . And so right now the ball is in *The New York Times*' court. And Tucker, if they don't have any more than they have shown and the McCain people are on the offensive, I think Keller ought to be out there and Punch Shulzberger should be called on the carpet because they put the credibility of a great institution, OK, a liberal institution. But *The New York Times* is a great newspaper. It's the gold standard of American journalism and they dragged it down into the gutter on a story which we've been told has nothing at all to do with it. This is head to head—look either John McCain is not telling the truth, which case he's out of the race if that's discovered, or the New York Times doesn't have the story and there was no affair and they implied something as false in which case the person that put out the story deserves to be thrown out on the street. . . ."

- David Gregory, an NBC News correspondent, stated: "Is John McCain a hypocrite? This is not whether he had an illicit affair. It's whether he is a hypocrite. Did he have any kind of relationship — sexual, romantic, or otherwise — with a lobbyist that led him to do things that were improper?"

- Tucker Carlson in his television broadcast on his show "Tucker" on MSNBC, stated that "John McCain takes on *The New York Times* after the paper publishes a piece that suggests but doesn't prove that McCain had an inappropriate relationship with a Washington telecom lobbyist nine years ago and may have used his influence as the chairman of the Senate Commerce Committee on her behalf and behalf of her clients."

- Matthew Yglesias, writing in *The Atlantic.com*, wrote: "the *Time*'s effort to substitute innuendo for making a straightforward true or false assertion is [sic] seems like a pretty shameful attempt to set up a Kaus-like presumption of guilt. If they have reporting they're willing to stand behind of a McCain-Iseman affair, they should publish it. And if, as seems to be the case, they don't have the reporting, then they shouldn't write the story."

- Scott Wooley, writing for Forbes Magazine, described the article as "hinting that the two may have had an affair," and exploring whether Senator McCain subsequently acted improperly on behalf of Ms. Iseman's clients.

- Bill O'Reilly, broadcasting on Fox News, stated: "*The New York Times* article Thursday implies Senator McCain had an inappropriate relationship with lobbyist Vicki Iseman, perhaps romantically. McCain quickly denied any wrongdoing and criticized The Times. Well, what's improper, sir, is even raising those kinds of questions, based on two anonymous sources, who according to *The Times* don't even like McCain. That's brutally unfair. The key paragraph in *The New York Times* article is this: 'Both [sources] said Mr. McCain acknowledged behaving inappropriately and pledged to keep his distance from Ms. Iseman. The two associates, who said they had become disillusioned with the senator, spoke independently of each other and provided details that were corroborated by others.' What details? Acknowledged behaving inappropriately how? Those questions

aren't answered by *The New York Times*. This is incredibly sloppy journalism, is it not? Come on. Here's a guy running for president, and you're implying things that could ruin him? Based on what? If John McCain did indeed do something wrong, prove it. Have these anonymous people come out and lodge the accusation. Don't smear the man with innuendo."

- Michael Sherer, a reporter for *Time Magazine*, wrote in a blog entry in *The Huffington Post*, wrote: "In the wake of a scandalous *New York Times* story suggesting a romantic fling with a lobbyist, McCain arrived at a Ford Focus car assembly plant with a decidedly tense grin plastered across his face."

- Gabriel Sherman, writing in *The New Republic* about *The National Enquirer* and its editor David Perel, described the article as "the *Times*' now infamous front-page investigation suggesting John McCain had carried on an affair with the telecommunications lobbyist Vicki Iseman while he ran the Senate Commerce Committee during the 1990s. Normally, in the pitched tabloid battle for exclusives, losing a competitive bombshell like the McCain scandal would send Perel into fits. Not this time. Five *Enquirer* reporters had spent more than a month in 2007 chasing down the same rumors but failed to uncover any documentary evidence. "I wouldn't have run that piece, there was nothing in it," Perel told me recently about the *Times* story, which received widespread criticism when it ran. "It was filled with innuendo. When you're done reading it, you're like, there's no *there* there."

- A story by Michael Calderone in *Politico.com* on December 22, 2008, on the top ten media blunders of 2008, listed the *New York Times* story as number two on the list, stating: "The New York Times' McCain-Iseman story: There was so much hype leading

up to The Times front-page investigation of John McCain's relationship with lobbyists—dating back at least to a Drudge leak two months earlier—that without something concrete, the story was doomed to fail. Executive editor Bill Keller said there's more to the piece than the strongly suggested, never outright stated, romantic relationship between the senator with lobbyist Vicki Iseman, but that's what the public seized upon. The Times put it out there, but couldn't prove it, leading both the right and left to slam the piece."

33. Most significantly of all, *The New York Times'* own public editor, Clark Hoyt, interpreted the article as communicating that Ms. Iseman and Senator McCain had engaged in an inappropriate romantic relationship. Writing on February 24, 2008, three days after the defamatory February 21 article first appeared, *The New York Times'* public editor addressed the enormous wave of e-mail messages to *The New York Times* complaining about the article, gleaning from the article the central message that Ms. Iseman and Senator McCain had engaged in an inappropriate romantic relationship. The Public Editor for *The New York Times* thus wrote:

> But judging by the explosive reaction to the 3,000-word article, most readers saw it as something else altogether. They saw it as a story about illicit sex. And most were furious at *The Times*.
>
> Four highly respected reporters in the Washington bureau worked for months on the story and were pressed repeatedly to get sources on the record and to find documentary evidence like e-mail. If McCain had been having an affair with a lobbyist seeking his help

on public policy issues, and *The Times* had proved it, it would have been a story of unquestionable importance.

A newspaper cannot begin a story about the all-but-certain Republican presidential nominee with the suggestion of an extramarital affair with an attractive lobbyist 31 years his junior and expect readers to focus on anything other than what most of them did. And if a newspaper is going to suggest an improper sexual affair, whether editors think that is the central point or not, it owes readers more proof than *The Times* was able to provide.

## VI. Falsity

34. The defamatory statements, express and implied, that Ms. Iseman had a romantic relationship with Senator McCain, are entirely false. The defamatory statements, express and implied, that Ms. Iseman exploited an alleged personal or social relationship with Senator McCain to seek favorable outcomes or improper influence on behalf of clients, are entirely false. Ms. Iseman has never had a romantic relationship of any kind with Senator McCain. Ms. Iseman did not engage in any behavior toward him that was anything other than professional and appropriate. The plane trip that Senator McCain took in which Ms. Iseman was also present as the representative of her client, the owner of the plane, included John Weaver as a passenger. Ms. Iseman's relationship with Senator McCain was entirely professional, ethical, and appropriate. Ms. Iseman's relationship with Senator McCain was not different in kind from the cordial yet professional relationship that hundreds of lobbyists have with hundreds of members of Congress. While Ms. Iseman was cordial and respectful to Senator McCain, her behavior

toward him did not differ from the cordial, professional and respectful demeanor she employed with respect to all members of the Senate or House of Representatives with whom she would routinely interact in her role as a lobbyist. Ms. Iseman never touted, bragged about, traded upon, or otherwise exploited any "special" or "personal" relationship with Senator McCain to clients or others, and she did not in fact have any such relationship.

35. The defamatory statements attributed to Mr. Weaver published in *The New York Times* article on February 21, express and implied, that Weaver's brief conversation with Ms. Iseman at Union Station was only about "her conduct and what she allegedly had told people, which made its way back to us," were entirely false. John Weaver did not discuss any such statements allegedly made by Ms. Iseman to others during their meeting at Union Station. More significantly and more substantively, Ms. Iseman engaged in no improper conduct, romantic or otherwise, in relation to Senator McCain, and Ms. Iseman had never and has never stated or suggested otherwise to any other persons. All of John Weaver's reported statements, express and implied, making such accusations against Ms. Iseman, are false. While Weaver is quoted as confronting Ms. Iseman after "discussion with campaign leadership", two of Senator McCain's "small circle of advisors" definitively disputed Mr. Weaver's account.

### VII. Damage to Reputation and Damage to Emotional and Mental Health

36. The defamatory statements, express and implied, communicated by *The New York Times* article were deeply destructive and tremendously damaging to Ms. Iseman, both with regard to her external reputation, and with regard to her internal mental health, peace-of-mind and general health.

37. In the immediate aftermath of the article's publication, Ms. Iseman attempted to deal stoically with her outrage and anger. Ms. Iseman did not wish to become an object of prurient

and salacious curiosity. Ms. Iseman did not wish to surrender her quiet professionalism. Ms. Iseman did not enter the public arena, appear on talk shows, or engage in media interviews in the immediate weeks and months following publication of the false and defamatory article. Ms. Iseman told herself, her family, her friends, and her colleagues, that her goal to just push forward normally with her work and routines.

38. Ms. Iseman realized in the near and far term aftermath that all hope of anything resembling a normal life for her had been destroyed and permanently altered by the defamatory article published by *The New York Times*.

39. The article was immediately and powerfully damaging to Ms. Iseman's reputation. She was viewed as someone who used an inappropriate romantic relationship as a means of obtaining legislative influence.

40. Immediately following the publication of the article, it became apparent that Ms. Iseman's reputation had suffered enormous damage. Statements concerning Ms. Iseman dripping with cruel ridicule and derision swept across the Internet. Within her professional and social world, Ms. Iseman was suddenly controversial and suspect. Professional associates, clients, members of Congress, congressional staffers, and others that were vital to Ms. Iseman's livelihood and reputation changed their attitude toward her. *The New York Times* has never apologized for the damage caused to Ms. Iseman, or retracted its story and the defamatory implications conveyed by the story. The defamatory allegations in story continue to be repeated. The damage to Ms. Iseman caused by the story has continued to the present and has not abated.

41. The article destroyed the heart and soul of Ms. Iseman's professional identity and sense of personal self-worth. Ms. Iseman was a self-made woman from a small town who worked her way up through the world of Washington, D.C. She worked two jobs in college and a

second job in her first years at Alcalde & Fay a firm for which she has worked for 18 years. She has always taken great pride and satisfaction in her work, and derives a large part of her identity from her professionalism. She prided herself on hard work, professionalism, and knowing her business, often working 12 hour days, and weekends. Ms. Iseman has diligently without fanfare established a reputation with Congressional offices and clients as a conscientious professional who masters complex and technical legislative issues and advocates on their merits.. No client has ever hired Ms. Iseman to singularly impact a particular Member of Congress. All of the clients mentioned in *The New York Times* article are familiar of Ms. Iseman's "big tent" approach to advocacy on their behalf, an approach based on meetings with multiple decision-makers and grounded on advocacy on the merits of the issues involved. Ms. Iseman shunned publicity or media attention. She did not trade in romantic relationships or gender politics as a means of advancing her career or the interests of her clients. To be portrayed as someone who would engage in an inappropriate romantic relationship with a Senator before whom she conducted business on behalf of clients, was to cut at the heart of all that Ms. Iseman was, stood for, and believed in.

42. The external damage to Ms. Iseman's reputation led to a corresponding deterioration of her internal mental, emotional and physical health. As days and weeks went by, and the cruel gossip, whispers, blogs, rumors, confrontations, and innuendo about her continued, her despondency over the publication of the article and its impact on her life grew. Ms. Iseman suffered intense and severe emotional, psychological, and medical distress and damage as she experienced the destruction of her reputation, identity, and sense of self-worth. Ms. Iseman was a hard-working, focused, determined professional. Ms. Iseman was a strong, self-reliant person, that was used to dealing with complex, high pressure matters. She was not fragile or thin-

skinned. Yet the defamatory article published by *New York Times* nearly destroyed her. The relentless pounding of the repetition of the insinuations contained in *The New York Times* story was overwhelming and intolerable. It was after realizing the broad damage to her reputation and the deep damage to psychological health that Ms. Iseman realized that she had to fight back to vindicate her reputation, redress the violation of her human dignity, and restore her sense of self-worth.

### VIII. Fault—Negligence and Actual Malice

43. The New York Times Defendants acted with negligence and with actual malice in publishing the false and defamatory statements, express and implied, contained in the February 21 article "of and concerning" Ms. Iseman.

44. *The New York Times* article was deliberately and recklessly misleading in failing to place in truthful context the statements of the principal source for the article, and the only source identified in the article in relationship to the defamatory statements regarding Ms. Iseman, John Weaver. Mr. Weaver is a political consultant and was a former chief aid and high-ranking campaign official for the 2008 presidential campaign of Senator John McCain. He was one of the high-ranking campaign advisors whose relationship with Senator McCain's campaign was severed on July 10, 2007, when Senator McCain's campaign was at a low point, suffering fundraising and polling difficulty. His subsequent disputes with the campaign have been widely publicized. Among other things, Mr. Weaver, according to *The New York Times* article, claimed that in his Union Station conversation with Ms. Iseman he warned her to stay away from Senator McCain because of "her conduct and what she allegedly had told people, which made its way back to us." John Weaver made no such statement to Ms. Iseman in their Union Station meeting. Ms. Iseman had never engaged in conduct that was inappropriate in relation to Senator McCain.

Ms. Iseman did not tell others that she had a romantic relationship with Senator McCain or had any other form of inappropriate relationship with Senator McCain and Senator McCain's campaign leadership also denied the allegation. Ms. Iseman communicated these facts to the New York Times Defendants prior to publication of *The New York Times* article. The failure of the New York Times Defendants to place Mr. Weaver's role in its full and truthful context both enhanced the defamatory sting of the article and further demonstrate the negligence and actual malice of the New York Times Defendants.

45. Ms. Iseman is a private figure, and as such need only plead and prove negligence to support her defamation claim. Ms. Iseman , however, also alleges actual malice by all Defendants.

46. Prior to the publication of *The New York Times* article, Ms. Iseman was able to conduct her business as a lobbyist as a private figure. She did not conduct her business through media channels, and her name did not appear in media accounts. Indeed, in the reporting that surrounded the original 1999 events involving Senator McCain's interactions with the Federal Communications Commission relating to Ms. Iseman's clients, Ms. Iseman *was not named*.

47. In 2008, when *The New York Times* revived this matter for the transparent purpose of attempting conveying the defamatory statement that Ms. Iseman had been involved in an inappropriate romantic relationship with Senator McCain in 1999, it was reviving a story nine years stale. Yet even *The New York Times* itself, which reportedly extensively on the events surrounding Senator McCain's 1999 activities in relation to the Federal Communications Commission and Paxson Communications, in reporting done for *The New York Times* by reporter Stephen Labaton, one of the present Defendants, *did not mention* Ms. Iseman in its

contemporaneous 1999 coverage of those matters, underscoring that she was not a public figure at the time of the events.

48. Ms. Iseman was not a public figure at the time of the 1999 events that were the subject of *The New York Times* article, has had engaged in no activity since 1999 to make herself a public figure. Ms. Iseman was not named in any news accounts involving Senator McCain, his campaign for the presidency in 2000, his campaign for the presidency in 2008, or his period of Chairmanship of the Senate Committee on Commerce, Science, and Transportation. Ms. Iseman never sought media attention with regard to any of these matters, and never sought to enter the arena of general public debate. To the contrary, Ms. Iseman eschewed media attention. When the issues on which she worked as a lobbyist required interactions with the media, Ms. Iseman declined interaction with the press, leaving those interactions to others. Ms. Iseman was and is an intensely private person who has steadfastly guarded her privacy, drawing a strong line separating her personal and professional life.

49. By any plausible measure, the publication of the cruel and explosive defamatory article published on February 21, 2008, which The New York Times Defendants knew and should have known would cause enormous damage to the reputation and mental and emotional well-being of Ms. Iseman, was a negligent deviation from norms of ordinary and reasonable care.

50. The New York Times Defendants published the article with "actual malice" within the First Amendment meaning of that phrase—with knowledge of falsity or reckless disregard for truth or falsity.

51. The New York Times Defendants were relentless and obsessive in their pursuit of this defamatory story. From the beginning of their long reporting effort the New York Times

Defendants were committed to the pre-conceived supposition that Senator McCain had engaged in an affair with Ms. Iseman. This sensational story could well have ended the presidential campaign of Senator McCain. It could have been the equivalent of the infamous Garry Hart liaison with Donna Rice that ended Senator Hart's presidential campaign at a time when he was the leader in the race for the Democratic Party nomination for President. It could have been the equivalent of President Clinton's notorious relationship with Monica Lewinsky. The New York Times Defendants were unremitting in their pursuit of Ms. Iseman, presenting her with aggressive e-mail messages which often contained false and misleading factually suppositions, phone messages, and even messages left on the doorstep of her residence, despite her strong and on-the-record statement to the New York Times Defendants that she had never engaged in any romantic or inappropriate relationship with Senator McCain of any kind, and that she did not want her privacy, her home and her work invaded by the New York Times Defendants' obstinate pursuit of a spurious story.

52. After pursuing the story for months, The New York Times Defendants had failed to find any credible evidence that a romantic relationship between Ms. Iseman and Senator McCain had ever taken place. The New York Times Defendants failed to find any evidence because there was no evidence. There was no evidence because there was no romantic relationship. There was no evidence because there were no inappropriate legislative favors.

53. Within the editorial and journalistic circle of *The New York Times*, there was resistance to publication of the story, because the story could not be "nailed down."

54. It was widely known within Washington political and media circles that *The New York Times* was pursuing the story. Other journalists from other news organizations, learning that *The New York Times* was pursuing the story, also investigated the story. This included

media outlets ranging from *The Washington Post* to *The National Enquirer*. None of these other news organizations published story linking Ms. Iseman romantically to Senator McCain, however, because none of these other news organizations ever turned up any credible evidence supporting such a story.

55. The pressure on *The New York Times* to produce intensified on December 20, 2007 when blogger Matt Drudge wrote in his *Drudge Report*, an on-line blog, Senator McCain was engaged in a "ferocious behind the scenes battle" with *The New York Time*, urging *The New York Times* to "spike" the story it was pursuing that would link Senator McCain to a Washington lobbyist. The *Drudge Report* included the claim that reporter Jim Rutenberg had hoped for *The New York Times* "to break the story before the Christmas holiday, sources reveal, but Editor Keller expressed reservations about journalism ethics and issuing a damaging story so close to an election."

56. The pressure on *The New York Times* also intensified as *The New Republic* began working on a story about *The New York Times*' pursuit of the story. Gabriel Sherman would ultimately come to write a story in *The New Republic* about *The New York Times*' pursuit of the story, and the internal conflict within *The New York Times* concerning the story, immediately following the publication of the February 21, 2008 article.

57. The New York Times Defendants became increasingly concerned that some other news organization would break the story before *The New York Times*, scooping the *New York Times*. The New York Times Defendants also became concerned that *The New Republic* would release its story about *The New York Times* failed and obsessive pursuit of the story, including its inability to "nail down" the scandalous accusations.

58. Succumbing to these pressures, The New York Times Defendants published the story on February 21, fully knowing that as of the date of this publication, The New York Times Defendants had utterly failed to find evidence supporting their pre-conceived hypothesis that Senator McCain and Ms. Iseman had a romantic relationship. What The New York Times Defendants *did know* was that they had engaged in a prodigious effort to document a story that had not been documented. Throwing good money after bad, The New York Times Defendants failed to do what would have been journalistically honorable, in the best interests of a nation in the midst of an historic race for the presidency, and consistent with the principles of the law of defamation and the First Amendment to the Constitution of the United States. The New York Times Defendants failed to kill the story.

59. The result was an ill-fated compromise that was carefully crafted to pack the maximum sensational impact with the minimum factual support. The New York Times Defendants made the worst possible decision, disingenuously crafting a manipulative article that dropped bombshells of salacious and spicy innuendo and implication, callously destroying Ms. Iseman's reputation, yet presenting no proof to back the allegations made.

60. The New York Times Defendants knowingly and recklessly led readers to believe that an illicit and inappropriate romantic relationship or unethical professional relationship existed between Ms. Iseman and Senator McCain, when The New York Times Defendants knew full well that they had failed to establish the existence of any such a relationship. The New York Times Defendants knew and intended that the defamatory article would be interpreted by readers *precisely as it was in fact* interpreted. As *The New York Times'* own public editor Clark Hoyt observed three days after the publication of the fateful February 21 article, the alleged inappropriate romantic relationship between Senator McCain and Ms. Iseman, which was the

opening theme and principal emphasis of the article, was all and everything that anyone and everyone would focus upon.

61. The New York Times defendants knew that this story would reverberate around the world, and be repeated incessantly by other news organizations in print and broadcast media, and by millions of Internet messages and postings and are responsible for all of that reasonably foreseeable republication of the defamatory content that originated with *The New York Times*. In their attack upon Senator McCain, The New York Times Defendants were willing to sacrifice Ms. Iseman as acceptable collateral damage, recklessly indifferent to the avalanche of scorn, derision, and ridicule Ms. Iseman would suffer.

62. For a newspaper with the stature, history, influence, and reputation of *The New York Times* to deliberately write an article pounding incessantly on the sensational allegation that Ms. Iseman and Senator McCain had an inappropriate romantic relationship, when The New York Times Defendants knew they had failed to document that claim, was "actual malice" at its worst. The article's repeated use of the word "romantic" was deliberately calculated to convey the full range of meanings commonly associated with that term, including in particular, as evidenced by the media reports interpreting *The New York Times* article such as those quoted in Paragraph 32 of this Complaint, the defamatory insinuation that the so-called "romantic relationship" was sexual. As alleged in Paragraph 33 of this Complaint, in the words of *The New York Times*' own public editor Clark Hoyt, "judging by the explosive reaction to the 3,000-word article, most readers saw it as . . . as a story about illicit sex." As Mr. Hoyt wrote about his own paper, *The New York* Times, "if a newspaper is going to suggest an improper sexual affair, whether editors think that is the central point or not, it owes readers more proof than *The Times* was able to provide." The publication of the article by the New York Times Defendants was done with

"knowledge of falsity," in the sense that The New York Times Defendants knowingly unleashed the innuendo that *they possessed evidence corroborating the existence* of such an illicit romantic relationship, when in fact no such corroborative evidence existed. So too, this was reckless disregard for or falsity in the classic sense—it was publication that deliberately created the impression that the New York Times Defendants had *no doubt* that Ms. Iseman and Senator McCain had an improper romantic relationship, when in fact they had failed to ever "nail down" the story. The New York Times Defendants *knew they did not know*—and brazenly published anyway.

## IX. Conclusion

63. Liberals may live to love *The New York Times*, and conservatives may live to hate it, but all must admit that it has historically been among a handful of American media outlets that occupy a unique niche of authority and respect within American and world culture. The very position that *The New York Times* occupies in American society, its reputation as a "newspaper of record," as "The Grey Lady," underscores both the damage caused by such reckless reporting and the egregious fault of The New York Times Defendants in publishing the defamatory article. The American and world public does not read *The New York Times* as if it is a tabloid tossing out defamatory insinuation and innuendo. The famous tag-line of *The New York Times*, publishing "all the news that's fit to print," has long carried the corresponding journalistic responsibility and promise to the public that what is printed reflects a considered professional judgment that it is indeed "news" that is "fit to print." Readers read *The New York Times* in the belief that the paper neither states nor implies a fact unless it has the evidence to back it up. In publishing an article clearly implying that Ms. Iseman had an unethical, illicit romantic relationship with Senator McCain, The New York Times Defendants betrayed that trust. The New York Times

35

Defendants traded on the reputation of the paper to destroy cavalierly the reputation of Ms. Iseman. In legal terms, this was an act of negligence and actual malice. In human terms, this was an act of callous indifference to human decency and human dignity.

### X. Prayer for Relief.

64. In compensation for the general damage to Ms. Iseman's reputation throughout the United States and the world, and in compensation for the damage done to Ms. Iseman's mental, emotional, and physical health and well-being, Ms. Iseman seeks the sum of TWENTY-SEVEN MILLION DOLLARS ($27,000,000.00) in actual and presumed damages from the Defendants, jointly and severally, and such other relief as the Court may deem just.

TRIAL BY JURY IS DEMANDED.

VICKI L. ISEMAN,

By: _____
W. Coleman Allen, Jr., Esq.
Virginia Bar Number: 19847
Attorney for Plaintiff Vicki L. Iseman
Allen, Allen, Allen & Allen
1809 Staples Mill Road
Richmond, Virginia 23220
Phone: 804-257-7512
Fax: 804-257-7589
coleman.allen@allenandallen.com

By: _____
Rodney A. Smolla, Esq.
Virginia Bar Number: 32768
Attorney for Plaintiff Vicki L. Iseman
c/o Washington and Lee University School of Law
Sydney Lewis Hall
Lexington, Virginia 24450
Phone: 540-458-8501
Fax: 540-458-8488
smollar@wlu.edu